UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ADAMAR OF NEW JERSEY, INC. t/a : 
THE TROPICANA CASINO & RESORT, :
:  Civil Action No.
            Plaintiff,  :  09-cv-2800 (NLH)(KMW)
:
     v.  :  **OPINION**
:
MARK LUBER, :
:
            Defendant.  :

**APPEARANCES**:

Phillip S. Van Embden, Esquire
Phillip S. Van Embden, P.C.
P.O. Box 863
900 East Pine Street
Millville, N.J. 08332
*Attorney for Plaintiff Adamar of New Jersey, Inc.*

Lewis Richard Bornstein, Esquire
Lewis R. Bornstein P.C.
1236 Brace Road
Suite K
Cherry Hill, N.J. 08034
*Attorney for Defendant Mark Luber*

**HILLMAN, District Judge**

Plaintiff, Adamar of New Jersey, Inc., trading as The Tropicana Casino & Resort ("Adamar" or "Tropicana"), has brought suit against Defendant, Mark Luber, for breach of contract in the amount of $220,000. Adamar now moves for summary judgment against Luber. In turn, Luber cross-moves for summary judgment against Adamar.

For the reasons expressed below, Adamar's Motion for Summary

Judgment is granted in part and denied in part.  Further, Luber's Cross-motion for Summary Judgment is denied.

## I. JURISDICTION

This Court exercises subject matter jurisdiction over the underlying claim pursuant to 28 U.S.C. § 1332.  There is complete diversity between the parties in the underlying action.  Plaintiff, Adamar, is incorporated in the State of New Jersey with its principal place of business in Atlantic City, New Jersey.  Defendant, Mark Luber, is a citizen of the Commonwealth of Pennsylvania.  The amount in controversy exceeds $75,000.

## II. BACKGROUND

On or around November 13, 2008, Mark Luber was a patron at the Tropicano Casino & Resort in Atlantic City, New Jersey.  Given his purported wealth and gambling history, Luber was recognized as a high-end customer who wagers large sums of money.  At Luber's request, Adamar provided pre-approved credit and an additional temporary extension of credit to him in the aggregate amount of $220,000 so that he could gamble at the casino.[1]  In exchange, Luber executed three counter checks, or casino markers, to Adamar during the course of the night.  Each check stated on its face:

> I represent that I have received cash for the

---

[1] Before he arrived at the Tropicana, Luber patronized another casino in Atlantic City earlier in the evening and utilized his credit to gamble there as well.

2

> above amount and that said amount is on deposit in said bank or trust company in my name. It is free from claims and is subject to this check.

(Plaintiff's Appendix ("Pl. App."), Exh. A, at 4). Luber executed the first check, and originally accessed his credit, for $100,000 around 8:46 p.m. He signed the second check for another $100,000 at approximately 9:04 p.m. Lastly, Luber attained additional credit worth $20,000 when he signed the third and final check around 11:30 p.m.

From approximately 9:00 p.m. to 2:00 a.m., Luber played at his own mini-baccarat table at the Tropicana. Michelle Mazzagatti served as his primary dealer. At her deposition, Mazzagatti testified that Luber appeared intoxicated during his time at the table, though she did not identify any particular signs or symptoms of inebriation that he may have exhibited. She also stated that Luber was continuously served alcoholic beverages.

For his part, Luber testified at his deposition that he could remember little, if anything, from the night in question. However, he acknowledged that he had utilized his credit line at the Tropicana and had outstanding debt with the casino. Luber also stated that when he frequents casinos, he often imbibes alcohol excessively, which impairs his judgment.

Sometime after Luber played at the casino, Adamar attempted to draw on the counter checks he had executed, but Luber's bank

refused to honor them due to insufficient funds. Unable to redeem the checks, Adamar sought repayment of the $220,000 credit directly from Luber. Luber, however, refused to repay the debt, arguing that casino employees continued to serve him alcoholic beverages even though he was already visibly intoxicated. Because he was inebriated, Luber believes he was legally incapable of entering into a valid contract with Adamar and that his agreement to repay them $220,000 is null and void.

On or around May 19, 2009, Adamar brought suit against Luber for breach of contract in the Superior Court of New Jersey. Luber removed the suit to this Court on the grounds of diversity jurisdiction. Further, he filed a third-party complaint against unknown casino entities and employees, alleging that those parties served him alcohol, or permitted the service of alcohol to him, at the casino when he was visibly intoxicated and, despite his conspicuous intoxication, allowed him to continue to gamble large sums of money.[2] In July 2010, Adamar moved for summary judgment. Several weeks later, Luber cross-moved for summary judgment.

## III. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate where the Court is satisfied

---

[2] Among his other averments, Luber also stated that due to his known visual impairment, he could not adequately review and approve the counter checks.

4

that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary

5

judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  <u>Anderson</u>, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).

**B.   Analysis**

According to Adamar, it is uncontroverted that Luber assumed an obligation to repay $220,000 when he borrowed from the casino.  No evidence in the record, says Adamar, establishes Luber's claim that he was visibly intoxicated and thus incapable of entering into a valid agreement to borrow and repay a sum of money.  On the contrary, Adamar believes that the evidence belies Luber's defense of intoxication and bolsters its own representations.

Conversely, by Luber's assessment, the casino's continued service of alcohol to him, a visibly intoxicated patron, impaired his judgment and rendered him incapable of contracting.  Luber asserts that his excessive consumption of alcohol, as induced and encouraged by Adamar and its employees, proximately caused and substantially contributed to his alleged gambling losses.  In light of the misconduct by Adamar and its employees, Luber concludes that Adamar breached the duty of good faith and fair dealing that it owed to him and that his contractual obligation to repay Adamar is void *ab initio*, voidable, and or subject to

6

rescission.

To establish a breach of contract claim, a plaintiff must show that (1) the parties entered into a valid contract, (2) the defendant did not perform its obligations under the contract, and (3) the plaintiff suffered damages as a result. Murphy v. Implicito, 920 A.2d 678, 689 (N.J. App. Div. 2007) (citation omitted).

Viewing the facts in a light favorable to Adamar -- as required when considering Luber's Cross-motion for Summary Judgment -- there is no doubt that a genuine issue of material fact exists with respect to Adamar's claim for breach of contract.  Adamar provided pre-approved credit and a temporary extension of credit to Luber to enable him to gamble at the Tropicana.  To access this credit, Luber signed and executed three counter checks.  During his deposition, Luber acknowledged that whenever he gambled at a casino, including the Tropicana, he relied on such credit.  Further, it is undisputed that Luber did not repay the $220,000 at issue in this matter.  When asked at his deposition to explain the current dispute between Adamar and himself, Luber answered: "I lost some money gambling.  They're trying to collect it."  (Pl. App., Exh. D, at 7).  Later, he affirmed that, although he could not remember any specific details, the amount he lost and owed to Adamar could be approximately $220,000.  When asked why he did not repay the

7

money he borrowed, Luber alluded to financial difficulties he was experiencing, including the loss of business revenue and debts he had incurred.

Therefore, assuming *arguendo* the validity of the contract, Luber breached the contract by not repaying the money that he borrowed and gambled on November 13, 2008 at the Tropicana. Adamar's damages include the $220,000 credited to Luber on that night.

A valid, common law defense to a contract claim, however, includes a party's lack of capacity to contract when that party is excessively intoxicated. See Feighner v. Sauter, 614 A.2d 1071, 1075 (N.J. App. Div. 1992) (stating that among the "[t]he usual grounds for rescission" of a contract is intoxication); see also Trump Taj Mahal Assocs. v. Allen, 2011 N.J. Super. Unpub. LEXIS 33, at **8-9 (N.J. App. Div. Jan. 6, 2011) ("'A contract should not be enforced where the mind of the party was so disqualified by excessive and complete intoxication that he was, at the time, mentally incapable of understanding the subject of the agreement, its nature, and probable consequences.'" (quoting Seminara v. Grisman, 44 A.2d 492, 495 (N.J. Ch. 1945))). Accordingly, excessive intoxication is also a viable defense to contracts arising between casinos and their patrons. See Hakimoglu v. Trump Taj Mahal Assocs., 876 F. Supp. 625, 633 (D.N.J. 1994) (noting that "when a casino comes to court to

enforce a marker debt against a patron, it seeks to enforce a contractual debt," and "[i]n that case, the patron is entitled to raise all the common law defenses to a contract, including that his capacity to contract was impaired by voluntary intoxication"), aff'd, 70 F.3d 291 (3d Cir. 1995); Lomonaco v. Sands Hotel Casino and Country Club, 614 A.2d 634, 638 (N.J. Law Div. 1992) (holding that "common law contract defenses of incapacity, duress, and unconscionability" apply to the casino context and casino markers); see also Annitto v. Trump Marina Hotel Casino, 2006 N.J. Super. Unpub. LEXIS 1769, at **26-27 (N.J. App. Div. Jul. 25, 2006) (affirming intoxication as a basis for rescinding a contract to repay a loan for gambling). However, "to avoid the contract the intoxication must have advanced to such a degree that the mental powers of reasoning and understanding of the contracting party are so deficient that he cannot realize and appreciate the nature and consequences of his act."  Seminara, 44 A.2d at 495.

Both parties seem to agree that if someone is so intoxicated at the time of contracting, he may be incapable of exercising his judgment and entering into a legally binding agreement.  Of course, the parties disagree whether that happened in this case. In support of his assertion that he was exceedingly intoxicated, Luber relies principally upon his own deposition testimony and that of Michelle Mazzagatti, his primary mini-baccarat dealer on

9

November 13, 2008.

At his deposition, Luber testified that at casinos, he often "drink[s] too much" alcohol. (Pl. App., Exh. D, at 24). Though he could not recall that particular day, Luber believed that he was intoxicated on November 13, 2008 when he visited the Tropicana. (Id.) When asked if he ever told anyone at the Tropicana that he was intoxicated, Luber responded, "If they didn't know it, they were pretty stupid."[3] (Id. at 44). At the casinos, Luber recalled, he is often served successive glasses of vodka, along with bottles of water. He also affirmed that the alcoholic beverages altered or impaired his judgment while he gambled, adding that he "was bombed" and "shouldn't have bet that much." (Id. at 53-54). As a result of excessive alcohol consumption, Luber concluded, "I didn't know what I was doing." (Id. at 60). Specifically, he was unaware of the amounts of money that he won or lost.

As for Mazzagatti, she testified that she had dealt to Luber on two occasions at the Tropicana. Regarding his alcohol consumption, the following exchange occurred between Luber's counsel and Mazzagatti:

> Counsel: Do you recall Mr. Luber drinking while he played?

---

[3] Though he did not say anything to casino personnel, Luber testified that his wife may have told someone at the Tropicana that he was intoxicated. However, Luber then clarified that his wife was not with him at the casino in November 2008.

> Mazzagatti: You're going to ask me what he drinks? Yeah, one night, he was -- he -- he was intoxicated; I could say that.
>
> . . . .
>
> Counsel: The night that you were dealing to him, he was intoxicated?
>
> Mazzagatti: Uh-huh.
>
> . . . .
>
> Counsel: How much was he drinking?
>
> Mazzagatti: Enough to go to the bathroom a few times.
>
> . . . .
>
> Counsel: Did the person that he was with help him to the men's room?
>
> Mazzagatti: No.  Just -- he took his time.  He has a -- he has a bad limp.
>
> . . . .
>
> Counsel: What did you observe about Mr. Luber's behavior while he was gambling on November 13, 2008?
>
> Mazzagatti: Well, I think his friend or his -- yeah, -- I would say his friend was trying to get him off the table. He was losing. He was drinking too much, and -- but he wouldn't, he wouldn't go.  He wasn't ready. [Luber] was getting a little, you know, he was getting annoyed because [his friend] was trying to get him away from the table.

(Pl. App., Exh. G, at 13-14).  Mazzagatti added that Luber was not so intoxicated that he was falling off his chair or that he had any trouble getting to the bathroom.  In response to a series of questions posed by Adamar's counsel, Mazzagatti also testified

11

that Luber was able to place bets in the normal course of play, was aware that he was losing and became frustrated, and did not slur his speech, put his head down on the table as if he were tired, or say that he was inebriated.  In addition, though she did not know what exactly he drank or how much, Mazzagatti observed a glass in front of Luber throughout the night and recalled that "he had [a drink] constantly" and "it was always fresh."  (Id. at 25, 38).

At this stage of litigation, with respect to Adamar's motion, the Court must accept Luber's evidence as true and draw all reasonable inferences in his favor.  See Marino, 358 F.3d at 247.  Taken together, and construed liberally, Luber's evidence may suggest to a reasonable fact-finder that Luber was intoxicated at the time that he executed one or more of the counter checks at the Tropicana on November 13, 2008. Indisputably, Luber received alcoholic beverages throughout the night while he gambled.  Consistent with his other ventures to Atlantic City, Luber believes he imbibed alcohol excessively on November 13, 2008 and that the libations impaired his judgment. He noted that his signature on one of the counter checks may exemplify his intoxication that night.  Mazzagatti, who likely had the most interaction with Luber and the greatest opportunity to observe him on November 13, 2008, considered Luber to be intoxicated on that night.  She corroborated the fact that he

12

always had a beverage in front of him.

Were the jury to consider the evidence and conclude that Luber was intoxicated on November 13, 2008, it could then decide whether the degree of intoxication was so substantial and debilitating as to render Luber incapable of entering into a valid contract, *i.e.*, the execution of the counter checks. Similarly, the jury could determine whether Luber appeared visibly intoxicated but nevertheless was served alcohol continuously throughout the night by casino employees. Both of those determinations, if necessary, are properly reserved for a jury to decide.

Notwithstanding Luber's proofs, the Court acknowledges the substantial evidence countervailing his intoxication defense. For example, Luber does not recall any specific facts of the night of November 13, 2008, instead relying almost exclusively upon his other experiences of gambling and drinking in Atlantic City to inform his recollection of the relevant night. Also, by his own estimation, Luber has a considerable tolerance for alcohol consumption. Moreover, Luber's extensive history of gambling and utilizing credit could belie any claim that he did not understand or appreciate his execution of the counter checks.[4] Similarly, while Mazzagatti attested to Luber's

---

[4] Luber emphasizes how his intoxication affected his gambling, specifically the amounts he bet and his awareness of his wins and losses. Insofar as his play may exhibit the degree

13

apparent intoxication, she did not proffer much specific detail to augment her conclusion. In fact, most of Mazzagatti's observations, as described during her deposition, suggest that Luber was aware of his surroundings and did not exhibit any conspicuous symptoms of excessive intoxication.[5]

Nevertheless, the credibility and weight attributable to the testimony of the parties or witnesses, and the inferences to be drawn from that evidence, must be determined by the fact-finder and not this Court. The Court merely notes that at trial,

---

of his intoxication, it is relevant. The Court, however, is not convinced that simply because alcohol consumption may have impacted Luber's gambling, he must have been so intoxicated as to render him incapable of executing the counter checks. In the end, Luber's capacity to understand and enter into the transaction for credit is the relevant inquiry, not whether he may have gambled while intoxicated. That Luber may have gambled while intoxicated, in and of itself, is not dispositive of Luber's capacity to contract. See Hakimoglu, 876 F. Supp. at 633 n.7 ("The drunken patron is essentially saying he has been deprived of the capacity to enter a gambling contract through the conduct of the casino. This conduct arguably need not involve serving alcohol to him; it is enough if he is so drunk he cannot contract. This contract analogy falls short, however, if the gambling relationship is not contractual. The patron does not negotiate the terms of his relationship with the casino, nor can the patron or casino vary the rules of the game, the odds, or the payoffs . . . . In short, in the so-called gambling 'contract' there is no mutuality.").

[5] Adamar also adduces additional deposition testimony in support of its assertion that Luber was not visibly intoxicated when served alcoholic beverages by casino personnel. For example, Roxanne Meloy, a beverage server who worked the Tropicana mini-baccarat pit in which Luber gambled on the night of November 13, 2008, testified that each patron had to wait about an hour before receiving a drink. She also did not recall any dealings with any intoxicated patrons during her shift that night.

14

Luber's evidence must be sufficient to enable a reasonable jury to find in his favor.  Therefore, because Luber has presented evidence that creates a genuine issue of material fact regarding his intoxication defense, Adamar's Motion for Summary Judgment is denied in part.

However, Adamar also moves for summary judgment on Luber's defense concerning his visual impairment.  Though Luber avers that he could not contract on account of his diminished eyesight -- which, he says, the casino employees knew about -- there is simply no evidence, as a matter of law, to sufficiently create a genuine issue of material fact.

Luber testified that he has had "macular degeneration of the retina" for about twelve or fifteen years.  (Pl. App., Exh. D, at 48).  According to Luber, he cannot see much with his right eye and requires lots of light to see with his left eye.  Nevertheless, nothing demonstrates that he could not see or otherwise know of the contents of the three counter checks that he signed at the Tropicana on November 13, 2008.  In fact, his longstanding history and experience with credit markers would suggest otherwise.  Moreover, no evidence adduced shows that any casino personnel knew of Luber's visual impairment.  When asked if he knew whether Luber suffered from any visual impairment, Philip Weiner, a casino credit executive who presented Luber with a counter check on November 13, 2008, answered, "Not that I know

15

of, no." (Pl. App., Exh. F, at 16).

Therefore, with respect to Luber's defense of visual impairment, Adamar's motion is granted in part and Adamar is awarded summary judgment. On the other hand, because Adamar has presented evidence that creates a genuine issue of material fact regarding its breach of contract claim, Luber's Cross-motion for Summary Judgment is denied entirely.

## IV.   CONCLUSION

For the foregoing reasons, Adamar's Motion for Summary Judgment is granted in part and denied in part. Further, Luber's Cross-motion for Summary Judgment is denied. An Order consistent with this Opinion will be entered.


Dated: March 30, 2011           /s/ NOEL L. HILLMAN
At Camden, New Jersey           NOEL L. HILLMAN, U.S.D.J.